Alan E. Marder, Esq.
Jessica G. Berman, Esq.
Jil Mazer-Marino, Esq.
**MEYER, SUOZZI, ENGLISH & KLEIN, P.C.**
990 Stewart Avenue – Suite 300
Garden City, New York  11530-9194
(516) 741-6565
amarder@msek.com
jberman@msek.com
jmazermarino@msek.com

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------X

In re:

Jacoby & Meyers – Bankruptcy LLP, et al.

Debtor.

**Chapter 7**

**Case No. 14-10641**

------------------------------------------------------------------------X

JIL MAZER-MARINO, as Chapter 7 Trustee for
Jacoby & Meyers – Bankruptcy LLP and Macey Bankruptcy
Law, P.C.,

Plaintiff,

v.

THOMAS G. MACEY, JEFFREY J. ALEMAN,
RICHARD K. GUSTAFSON, II, SHOBHANA
KASTURI, GEORGE MACEY, and JASON SEARNS

Defendants.

**Adv. Proc. No.:**

------------------------------------------------------------------------X

## COMPLAINT

Jil Mazer-Marino, not individually but as chapter 7 trustee (the "**Plaintiff**" or "**Trustee**")

for the bankruptcy estates (the "**Estates**") of Jacoby & Meyers – Bankruptcy LLP ("**J&M**") and

Macey Bankruptcy Law, P.C. ("**MBL**" and together with J&M, the "**Debtors**"), by and through

her counsel, Meyer, Suozzi, English & Klein, P.C., as and for her Complaint against Thomas

G. Macey ("**Macey**"), Jeffrey J. Aleman ("**Aleman**"), Richard K. Gustafson, II

("**Gustafson**"), Shobhana Kasturi ("**Kasturi**"), George Macey ("**G. Macey**") and Jason

Searns ("**Searns**" and together with Macey, Aleman, Gustafson, Kasturi and G. Macey, the "**Defendants**"), hereby alleges as follows:

## INTRODUCTION

1.     This is an action to recover money damages resulting from Macey's, Aleman's, Kasturi's and Gustafson's negligence and breaches of fiduciary duties in connection with the Debtors' operations and the wind down of the Debtors' businesses. These four Defendants are the owners and officers of the Debtors and were in control of the Debtors, a law firm that operated in twelve states and that serviced tens of thousands of clients. These four Defendants shut the Debtors' operations down in a matter of months, without regard to the duties they owed to their creditors and clients, resulting in damages to the Debtors' estates.

2.     In addition, this action is to avoid and recover preferential transfers and intentional and constructive fraudulent conveyances of the Debtors' property to or for the benefit of each of the Defendants. Based on the Debtors' books and records (which are opaque in regards to certain large transfers to what look like entities owned by Defendants Macey, Aleman, and Searns), substantial transfers were made to or for the benefit of the Defendants in this proceeding.

3.     Lastly, this action seeks a judgement against Macey declaring that, as MBL's sole shareholder, he is liable for all of MBL's indebtedness incurred after the Illinois Supreme Court denied MBL's application to register as a professional corporation.

## PARTIES

4.     On June 16, 2014, the Trustee, Jil Mazer-Marino, was appointed the chapter 7 trustee of the Debtors' Estates pursuant to Bankruptcy Code section 702(d), title 11 of the United States Code (the "**Bankruptcy Code**").

2

5.      Upon information and belief, Macey is an adult individual who resides in Florida and, at all relevant times, was the (a) president of each of the Debtors; (b) owner of MBL; (c) owner of Macey Bankruptcy Law, LLC, which in turn is a partner in J&M; and (d) supervised, among others, Aleman, Gustafson and Kasturi.

6.      Upon information and belief, Aleman is an adult individual who resides in Illinois and, at all relevant times, was the Managing Attorney and a Senior Attorney for each Debtor. Aleman was responsible for the day to day operations of the Debtors, opening new offices for the Debtors, and the wind-down of the Debtors' businesses. In addition, Aleman supervised, among others, Gustafson, Kasturi, and other attorneys employed by the Debtors.

7.      Upon information and belief, Gustafson is an adult individual who resides in Illinois and, at all relevant times, was the Debtors' Treasurer and a Senior Attorney for each Debtor. Gustafson functioned as the Debtors' in house general counsel, oversaw the Debtors' finances, entered into agreements on behalf of the Debtors, and supervised attorneys employed by the Debtors.

8.      Upon information and belief, Shobhana Kasturi is an adult individual who resides in Illinois and, at all relevant times, was a Senior Attorney for each Debtor, was responsible for hiring, firing, training, and supervising attorneys employed by the Debtors, and supervised many of the Debtors' operations, including its call center.

9.      Upon information and belief, G. Macey is an adult individual who resides in Illinois and is Macey's brother.

10.     Upon information and belief, Searns is an adult individual who resides in Florida, was a co-owner of Legal Helpers Debt Resolution LLC with Macey, Aleman and Jeffrey Hyslip and, upon information and belief, was a co-owner of The Mortgage Law Group with Macey, and

3

was employed by or maintained an office with the Debtors.

## JURISDICTION AND VENUE

11.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 157(b)(1).

12.    The claims set forth in this action include core proceedings pursuant to 28 U.S.C. § 157(b)(2)(H).    The claims set forth in this action include non-core proceedings that are otherwise related to the Debtors' bankruptcy case under 28 U.S.C. § 157(c)(1).

13.    Venue of this adversary proceeding is proper pursuant to 28 U.S.C. § 1409.

14.    The Trustee consents to entry of final orders or judgments by the bankruptcy judge in this adversary proceeding.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### A.    The Chapter 7 Case

15.    On March 14, 2014, an Involuntary Petition for Relief was filed against each of the Debtors.

16.    On June 16, 2014, orders for relief were entered against each of the Debtors, and the Trustee was appointed the interim chapter 7 trustee of the Debtors' Estates pursuant to Bankruptcy Code section 701(a) and has since qualified as permanent trustee.

17.    On July 8, 2014, an order was entered providing for the Debtors' cases to be jointly administered for procedural purposes.

18.    The Trustee examined Macey on September 8, 2014 at a 341 meeting of creditors.

19.    The Trustee examined Aleman on October 20, 2014 at a continued 341 meeting of creditors.

**B.**    **The Debtors' Formation and Ownership.**

**(a)    MBL**

20.    MBL is an Illinois professional corporation that was formed in 1994 and previously named Legal Helpers, P.C.

21.    MBL is solely owned by Macey.

**(b)    J&M**

22.    J&M is a Washington, D.C. limited liability company formed in or about July 2012, under a certain operating agreement (the "**J&M Operating Agreement**").

23.    J&M is owned by Macey Bankruptcy Law Holding, P.C. and Jacoby & Meyers, LLC.

24.    Macey Bankruptcy Law Holding, P.C. is an Illinois professional corporation that was formed in 2012 and owned by Macey.

25.    Jacoby & Meyers, LLC was formed in 2012 and is owned, in whole or in part, by Keith Givens.

26.    The J&M Operating Agreement contemplates a merger of MBL into J&M.

27.    Upon information and belief, the merger of MBL into J&M was not consummated.

**C.**    **The Debtors' Operations**

28.    MBL, headquartered at 233 S. Wacker Drive, Chicago, Illinios, conducted business in Arizona, California, Colorado, Florida, Georgia, Illinois, Indiana, Michigan, Minnesota, New Jersey, New York, Ohio, Pennsylvania, Texas, Utah, Washington, Washington, D.C., and Wisconsin.

29.     MBL was engaged in the business of providing legal advice to individuals concerning consumer bankruptcy law and fair debt collection practices law and operated in some states under the name Legal Helpers.

30.     In or about March, 2011, Legal Helpers Debt Resolution, LLC ("**Legal Helpers Debt Resolution**"), an entity that provided consumer debt consolidation services, was the subject of a complaint filed by the Illinois Attorney General.

31.     Legal Helpers Debt Resolution was owned and controlled by Macey, Aleman, Jeffrey S. Hyslip, and Searns and, like MBL, was headquartered at 233 S. Wacker Drive, Chicago, Illinios.

32.     In or about 2012, Macey decided to rebrand MBL because of, among other things, state attorney general investigations into the operations of Legal Helpers Debt Resolutions.

33.     J&M was formed to enable the law offices operated by MBL to conduct business under the name "Jacoby & Meyers—Bankruptcy, LLC."

34.     After J&M's formation, MBL changed the name of several of its offices to Jacoby & Meyers Bankruptcy, LLC or some derivative of that name.

35.     In addition to its headquarters, in or about March 2013, the Debtors provided consumer bankruptcy law services out of approximately twenty main or hub offices with each main or hub office servicing up to three satellite offices.

36.     Each of the Debtors' hub offices employed an attorney, often referred to as a managing attorney, who was in charge of such office.

37.     Each managing attorney was a salaried employee of the Debtors and reported to Aleman or, in some instances, Kasturi, each of whom in turn, reported to Macey.

38.     Certain of the Debtors' hub offices employed additional attorneys and staff.

39.    Satellite offices were typically minimally equipped and, generally, would be open one or two days per week and staffed by one of the Debtors' "main office" attorneys.

40.    Upon information and belief, the Debtors operated on a consolidated basis and did not maintain separate bank accounts and did not maintain books and records on a non-consolidated basis.

41.    Payments received from clients at the main offices and the satellite offices were remitted to the Debtors' headquarters and deposited in one of the Debtors' accounts.

42.    All expenses for hub offices and satellite offices, including rent, furniture, fixtures, and equipment were paid on a consolidated basis from one of the Debtors' bank accounts.

43.    The Debtors maintained at least twelve accounts at JPMorgan Chase Bank, N.A., including six checking accounts and six IOLA or IOLTA accounts.

**D.    The Debtors' Management**

44.    The Debtors were owned and controlled by Macey.

45.    The day to day operations of the Debtors were managed by Aleman, Kasturi and Gustafson (the "**Senior Attorneys**").

46.    Aleman was the Debtors' Managing Attorney, was responsible for the Debtors' day to day operations, including opening new offices, and closing the Debtors' offices.

47.    Aleman reported directly to Macey.

48.    Kasturi was a Senior Attorney for the Debtors.

49.    Kasturi hired, trained, supervised, and fired attorneys, managed the Debtors' call center including establishing productivity goals for the call center, oversaw the operation of hub offices, assisted Aleman with the wind down of the Debtors' business and transfer of clients to new counsel and, along with Gustafson, was responsible for the disposition of client files.

50.     Gustafson was the Debtors' Treasurer, operated as the Debtors' general counsel and oversaw corporate issues, such as corporate formation and registration for the Debtors and their subsidiaries. Gustafson was in charge of the Debtors' books and records, including the Debtors' Quickbooks, and prepared the Debtors' quarterly profit and loss statements.

51.     Upon information and belief, Kasturi and Gustafson reported to Macey and Aleman.

52.     Macey, Aleman, Kasturi, and Gustafson were entitled to receive a salary and were entitled to participate in the Debtors' profits.

53.     Macey represented that none of the Debtors' attorneys or employees received profit sharing except Macey, Aleman, Kasturi, and Gustafson.

54.     The Debtors' books and records indicate that G. Macey, Macey's brother, also received distributions on account of profit sharing.

**E.     The Debtors' Financial Books and Records**

55.     Upon information and belief, the Debtors maintained financial books and records in electronic and hard copy form.

56.     The Debtors used QuickBooks software to maintain their financial information.

57.     Despite the fact that the Debtors maintained a networked computer system, the QuickBooks software resided on two stand-alone computers; one used by Gustafson and the other by the Debtors' bookkeeper.

58.     The Debtors' paper financial files, such as profit and loss statements and expense reports, were kept in Richard Gustafson's office at the Debtors' Chicago headquarters or in an offsite storage facility.

59.     Some of the information contained in the hard copy files, such as distributions of the Debtors' profits to Macey, Aleman, Kasturi, Gustafson and G. Macey, is not found in the

Debtors' Quickbooks.

## F.    The Debtors' Electronic Client Files

60.    The Debtors' electronic client files were maintained on a networked computer system, accessible from all hub offices that ran a computer program that was referred to by the Debtors as the LH-1.

61.    The LH-1 software resided on a server stored off cite in Kankakee, Illinois and may have also been stored on other computers and servers used by the Debtors.

62.    The Debtors' employees, including attorneys, paralegals and administrators, input the clients' contact information, credit card information, case information, calendar dates, deadlines, attorney client communications, and attorney notes into the LH-1.

63.    Information regarding client accounts (*i.e.*, payments made by clients and amounts due from clients) was also stored on the LH-1.

64.    Virtually all information regarding the Debtors' clients was stored on the LH-1.

65.    A separate piece of customized software, known as Chrystal Reports, is required to aggregate data stored in the LH-1 and to generate any reports from the LH-1, even basic reports such as a list of clients and the amount of money received from such clients.

## G.    The Debtors' Paper Client Files

66.    Hard copy client files were maintained in the Debtors' headquarters or hub offices until a case was closed, at which time the paper files were stored in third party warehouses.

67.    Paper client files were not redacted prior to their being sent to storage. Personal and confidential information, such as social security numbers, remained in the files.

68.    Upon information and belief, client files are located in at least three separate warehouse facilities.

69.    Upon information and belief, no indexes exist that identify the client files in each

facility.

**H.   Actions by Attorneys General Against Entities Controlled by Macey and Aleman**

70.     Macey and Aleman are owners of Legal Helpers Debt Resolution and The

Mortgage Law Group (the "**Affiliates**").

71.     Upon information and belief, Legal Helpers Debt Resolution, (a/k/a/ the law firm

of Macey, Aleman, Hyslip & Searns) provided debt consolidation services to consumers from

approximately 2009 to 2014, although it stopped accepting clients in 2012.

72.     Upon information and belief, The Mortgage Law Group (a/k/a The Law Firm of

Macey, Aleman & Searns) provided mortgage modification services for consumers from 2010

through 2012.

73.     In or about March 2011, the Illinois Attorney General filed a lawsuit against

Legal Helpers Debt Resolution for, among other things, unlawfully charging consumers upfront

fees for debt settlement services.

74.     In or about July 2012, Legal Helpers Debt Resolution entered into a settlement

with the Illinois Attorney General that provided for it to pay $2.1 million in restitution for

Illinois residents who paid for debt settlement services but failed to receive meaningful debt

reduction. Also under the settlement, Legal Helpers Debt Resolution agreed not to accept any

new Illinois customers.

75.     On August 9, 2012, the State of Minnesota Commissioner of Commerce issued an

Order to Cease and Desist and Notice of Right to Hearing against Legal Helpers Debt Resolution

on the grounds that it operated as a debt settlement service provider without a license, charged

fees in excess of those permitted by statute, failed to provide mandatory disclosures, and made

misleading representations.

76.     On October 25, 2012, Indiana Attorney General brought an action against The

10

Mortgage Law Group, LLP, Legal Helpers Debt Resolution, Aleman, Macey, and Jason E. Searns, for, among other things, failing to obtain proper licensing, charging excessive fees, and failing to provide mandatory disclosures.

77.     In or about June 2013, Wisconsin Attorney General J.B. Van Hollen and the Wisconsin Department of Justice (DOJ) filed an enforcement action against Legal Helpers Debt Resolution, as well as the company's principal managers and owners, alleging that the defendants failed to obtain proper licensing and illegally charged exorbitant upfront fees.

78.     In or about May 2014, North Carolina Attorney General Roy Cooper filed suit against Legal Helpers Debt Resolution and its principals Jeffrey Hyslip, Searns, Aleman, and Macey alleging that they operated an illegal debt relief scheme in North Carolina.

79.     Legal Helpers Debt Resolution was a defendant in a class action suit captioned *Smith v. Legal Helpers Debt Resolution, LLC, et al.*, Index No. 3:11-cv-05054 (RJB) pending in the Eastern District of Washington that alleged that the defendants, among other things, illegally charged certain upfront fees in connection with debt resolution consulting services. That class action was settled pursuant to a settlement agreement requiring defendants to pay $2 million.

80.     On or about September 29, 2014, Legal Helpers Debt Resolution filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code in the Northern District of Illinois (Chicago) and the case is pending under the Index Number 14-35193.

**I.**     **Denial of MBL's Application for Certificate of Registration and Suspension of Macey's and Aleman's Licenses to Practice Law**

81.     On or about June 5, 2012, the Administrator of the Illinois Attorney Registration and Disciplinary Commission filed a Complaint with the Hearing Board of the Illinois Attorney Registration and Disciplinary Commission, Commission Numbers 2012PR0057 and 2012PR0058 against Macey and Aleman, respectively (the "**Disciplinary Proceedings**").

11

82.    In or about January 2013, MBL submitted its Application for Certificate of Registration to Engage in the Practice of Law as a Professional Corporation.

83.    The Clerk of the Supreme Court of Illinois did not file the Application because of the Disciplinary Proceeding against Macey.

84.    In or about 2013, MBL filed its "Petition to Continue Registration of Macey Bankruptcy Law, P.C., Pursuant to Supreme Court Rule 721" requesting the Court to allow the filing and renewal of the pending Renewal of the Registration of MBL pending the resolution of the Disciplinary Proceeding against Macey.

85.    In or about March 2013, the Supreme Court of Illinois denied MBL's motion for leave to renew registration for the year 2013, as of March 28, 2013, without prejudice to refile after conclusion of the Disciplinary Proceeding.

86.    After the motion was denied, MBL continued to hold itself out as a professional corporation and did not change its letterhead, business cards, website, or file pleadings in cases in which it had appeared to reflect that it was no longer registered to operate as a professional corporation.

87.    On or about December 10, 2014, the Hearing Board of the Illinois Attorney Registration and Disciplinary Commission issued a report and recommendation in the Disciplinary Proceedings recommending that Macey and Aleman each be suspended from the practice of law for two years.

88.    In or about May 2015, the Illinois Supreme Court acted upon the recommendation and suspended Macey and Aleman from practicing law in Illinois for two years, commencing June 4, 2015.

**J.    The Debtors Determine to Cease Operations**

89.    In or about the spring of 2013, shortly after MBL's motion to renew its registration was denied, Aleman and Macey determined to close certain main offices and satellite offices ostensibly because the offices were not operating as profitably as in the past.

90.    After identifying an unprofitable office, Aleman would advise the managing attorney for such office that the office was in danger of closing unless financial performance improved dramatically.

91.    In or about September 2013, the Debtors' commenced entering into agreements to close the unprofitable or less profitable offices.

92.    Upon information and belief, the Debtors accepted new clients and retainers into the fall of 2013, notwithstanding that the Debtors were closing offices.

93.    In November 2013, Macey instructed Aleman to terminate the Debtors' operations entirely.

94.    By December 31, 2013, all of the Debtors' offices were closed and the Debtors' assets had been assigned to an assignee for the benefit of creditors.

**K.    The Transition Agreements**

95.    Pursuant to Macey's instructions, Aleman was responsible for transitioning the Debtors' clients to new counsel.

96.    From September 2013 through December 2013, the Debtors entered into agreements with attorneys or law firms providing for such attorneys or firms to take over the representation of certain of the Debtors' clients.

97.    In certain instances, the substituting counsel was a former employee of the Debtors that represented the clients on behalf of the Debtors.

13

98.     In certain instances, substituting counsel was one of the Debtors' competitors.

99.     Aleman entered into no less than 24 agreements to transfer the Debtors' existing clients from all of its hub and satellite offices to attorneys that once worked for the Debtors or to the Debtors' competitors ("**Transition Agreements**").

100.    None of the Transition Agreements complied with state laws and rules requiring that the transfer of clients be done in a manner that protects the rights of the clients.

101.    Aleman drafted a template Transition Agreement that he used as a starting point for each Transition Agreement.

102.    Aleman admitted that he did not know whether the template Transition Agreement complied with the laws or regulations of any state.

103.    Upon information and belief, Macey made no effort to ensure that the template Transition Agreement complied with the laws or regulations of any state.

104.    Upon information and belief, Macey did not apprise himself of the Debtors' obligations under applicable state law regarding the transition of clients to new counsel.

105.    Aleman admitted that he did not seek any legal advice to determine whether any of the Transition Agreements that he entered into on behalf of the Debtors complied with applicable law.

106.    Upon information and belief, Macey made no effort to seek legal advice to determine whether any of the Debtors' Transition Agreements complied with applicable law.

107.    Aleman claims he relied on the attorney or the law firm that was acquiring the clients (the "**Acquiring Attorney**") to ensure that the Transition Agreements complied with applicable state law; notwithstanding the Acquiring Attorney owed no duty to the Debtors or the Debtors' clients to ensure that the Debtors fulfilled their fiduciary duties to their clients.

14

108.    Upon information and belief, neither Macey nor Aleman made an effort to determine whether the Acquiring Attorneys were familiar with the legal requirements for transitioning clients.

109.    In connection with each of the Transition Agreements, Aleman prepared a spreadsheet or caused a spreadsheet to be prepared using the LH-1 and Chrystal Reports and emailed the spreadsheet to the applicable Acquiring Attorney.  Those spreadsheets included personal information related to the clients, including name, address, phone number, email address, and amounts paid to the Debtors and were shared by Aleman without the clients' consent.

110.    Many Acquiring Attorneys dispute that the spreadsheets accurately reflected the amounts paid by clients to the Debtors and dispute that the Debtors delivered the appropriate amount of client funds to the Acquiring Attorney.

111.    Aleman did not preserve copies of those spreadsheets and does not know how copies of those spreadsheets could be obtained (except from an Acquiring Attorney).

112.    The Debtors' transfer of clients pursuant to the Transition Agreements failed to comport with the applicable law and rules of the states in which the Debtors conducted business regarding the transfer of clients to new counsel in several ways including, among other things:

(a)    The Debtors did not provide timely notice to their clients that they were ceasing operations.

(b)    The Debtors did not provide their clients with a reasonable opportunity to object to the transfer of their cases to the Acquiring Attorney.

(c)    The Debtors did not obtain written consent from their clients prior to transferring their files to the Acquiring Attorney, notwithstanding such files contained personal, privileged, and confidential information.

(d)    The Debtors failed to safeguard the personal, privileged, and confidential client files of clients that were not transitioned to Acquiring Attorneys

    (e)        The Debtors failed to account to clients for payments clients made to the Debtors.

    (f)        The Debtors failed to transfer the clients' funds to Acquiring Attorneys.

113.    By way of example, as set forth below, the Price Agreement, the Perez Agreement, the Magdy Agreement, the Cappio Agreement, and the Gallaway Agreement (as those terms are defined below) not only failed to comply with state laws, but caused significant confusion for and damages to the Debtors' clients and the transferee attorneys.

#### (i)    The Price Law Group Agreement

114.    On or about September 18, 2013, the Debtors entered into an agreement with the Price Law Group (the "**Price Agreement**") to transfer the Debtors' Long Beach and Glendale, California clients to the Price Law Group.

115.    Aleman testified that the Price Law Group was responsible for obtaining written consents from the Debtors' clients authorizing the transfer of client files from the Debtors to The Price Law Group.

116.    The Price Law Group denies that they mailed letters to the Debtors' clients to obtain the requisite written consents or that they had agreed to do so.

117.    The Price Law Group disputes that any clients or client files were transferred to The Price Law Group by the Debtors; albeit, The Price Law Group ultimately represented a small number of the Debtors' former clients that found The Price Law Group on their own.

118.    Upon information and belief, the Debtors instructed hundreds of clients with filed chapter 7 and 13 cases that The Price Law Group was their new attorney, and The Price Law Group informed such clients that The Price Law Group did not intend to represent them.

119.    Upon information and belief, (a) certain of the Debtors' former clients were left without representation once the Debtors' Long Beach and Glendale offices were closed; (b)

16

many of the Debtors' clients paid fees to the Debtors and were owed services and did not receive a refund or services; (c) the client files were not returned to the clients or directed to The Price Law Group and were disposed of without client consent.

### (ii)    The Perez Agreement

120.    In or about September 2013, the Debtors entered into an Agreement (the "**Perez Agreement**") with Bellah Perez, PLLC ("**Perez**") to transition the Debtors' Arizona clients to Perez.

121.    Paragraph 7 of the Perez Agreement provides that the "[Debtors] shall upon each client's agreement to the transfer, transfer any and all client filing fees held in [Debtor's] IOLTA Trust Account to [Perez]."

122.    Upon information and belief, many of the clients transferred to Perez had paid the Debtors all or a portion of the court fee to file their bankruptcy cases.

123.    Upon information and belief, none of the funds collected by the Debtors for filing fees was remitted to Perez or credited to the Debtors' clients.

124.    Upon information and belief, the Debtors collected funds from their Arizona clients for credit counseling.

125.    Upon information and belief, the credit counseling funds were not remitted to Perez, paid to credit counselors, or returned to the clients.

### (iii)    The Magdy Agreement

126.    Andrew Magdy was the managing attorney for the Debtors' St. Louis main office from February 2011 through July 2013, when Magdy resigned.

127.    In or about October 31, 2013, the Debtors entered into a Transition Agreement with Magdy (the "**Magdy Agreement**") referring approximately 180 clients from the Debtors to Magdy.

17

128.    Under the Magdy Agreement, the Debtors were obligated to prepare an introduction/explanatory letter that offered Magdy's services and to forward such letter to the Debtors' clients.

129.    The Magdy Agreement provides that after expiration of a reasonable time and without objection from client, the Debtors will transfer possession and ownership of the clients' files to Magdy.

130.    Magdy alleges that the Debtors never sent letters to all of the Debtors' clients purportedly transferred to Magdy and believes that only ten percent of the clients received letters or emails from the Debtors.

131.    Magdy further alleges that there were clients of the Debtors that paid the Debtors for client counseling but the Debtors failed to pay the credit counselors, remit those funds to Magdy, or return those funds to the clients.

132.    Magdy alleges that when the Debtors closed their St. Louis office, they abandoned several thousand client files in the Debtors' offices containing personal, privileged, and confidential client information.

            **(iv)    The Smith Agreement**

133.    In or about October 31, 2013, the Debtors entered into a Transition Agreement with R. Michael Smith (the "**Smith Agreement**") to transfer 176 of the Debtors' Cincinnati, Ohio clients.

134.    Under the Smith Agreement, the Debtors were obligated to prepare an introduction/explanatory letter that offered Smith's services and to forward such letter to the Debtors' clients.

135.    Smith contends that few of the 176 clients received the letter the Debtors were obligated to send to clients.

136.    Upon information and belief, Mr. Smith contacted the Debtors' landlord, obtained a new lease, and on November 1, 2013 moved his then-existing practice into the premises formerly occupied by the Debtors.

137.    After moving into the premises, Smith found approximately 400 client files, containing personal, privileged, and confidential information, that were in addition to the 176 client files Smith was to receive under the Smith Agreement.

138.    Upon information and belief, none of the 400 client files were transitioned to new counsel in anticipation of the Debtors' termination of services in Cincinnati.

### (v)    The Cappio Agreement

139.    In or about October 17, 2013, the Debtors entered into a Transition Agreement with Christopher G. Cappio, Esq. (the "**Cappio Agreement**") to transfer the Debtors' Philadelphia and Southern New Jersey clients.

140.    Under the Cappio Agreement, the Debtors agreed to send letters to their clients informing them that the Debtors were ceasing operations and introducing them to Cappio.

141.    Aleman represented that the Debtors prepared such introductory letters.

142.    Aleman does not believe the Debtors retained copies of the letters.

143.    Aleman testified that the Debtors did not keep copies of correspondence to clients as part of the regular conduct of their business.

144.    Under the Cappio Agreement, the Debtors' clients were to be provided with a reasonable opportunity to object to the transfer of their files to Cappio.

145.    Macey admitted that client files were transferred to Cappio without actual consent because some clients did not respond.

146.    Aleman testified that the Debtors did not maintain a record of clients that consented or objected to the transfer of their file to Cappio and had no knowledge of who kept

track of such information.

### (vi)    The Galloway Agreement

147.    On or about December 24, 2013, Aleman, on behalf of the Debtors, entered into a Transition Agreement with the Law Offices of Carol Galloway (the "**Galloway Agreement**") to transfer the Debtors' Florida clients.

148.    The Galloway Agreement provided that the Debtors' clients would have a reasonable opportunity to object to the transfer of their files.

149.    As of the date of the Galloway Agreement, Aleman was aware that the Debtors' assets were likely to be assigned to an assignee for the benefit of creditors; and, two weeks later, the Debtors entered into an assignment for the benefit of creditors and ceased all operations.

150.    Upon information and belief, Carol Galloway informed Aleman that the Florida State Bar required the Debtors to send certified letters to clients to inform them of the potential transition to new counsel.

151.    Upon information and belief, the Debtors failed to send letters to clients informing them that the Debtors were seeking to transfer their files to Galloway.  Moreover, upon information and belief, many of the clients purportedly transferred to Galloway under the Galloway Agreement had already replaced the Debtors with new counsel.

152.    Upon information and belief, when Galloway attempted to retrieve the Debtors' client files from their Florida office, the client files, containing personal and confidential information, were unorganized and left in boxes on the floor of the office.

### L.    The Assignment for the Benefit of Creditors

153.    On or about December 30, 2012, each Debtor entered into a certain Trust Agreement and Assignment for the Benefit of Creditors (each such agreement, a "**Trust Agreement**").

20

154.   Each Trust Agreement appointed Robert P. Handler (the "**Assignee**") of Commercial Recovery Associates, LLC as the assignee for the benefit of creditors.

155.   Each Trust Agreement was effective as of December 31, 2013, just two weeks after the Galloway Transition agreement was signed and only four months after the first Transition Agreements were entered into by the Debtors.

156.   At Macey's direction, Aleman was primarily responsible for transitioning the Debtors' assets to the Assignee.

157.   Aleman admitted that he had no recollection of any discussion of what resources would be available after December 31, 2013 to enable clients to retrieve their files.

158.   Aleman admitted that the Debtors did not designate anyone to ensure that hard copy and electronic client files from the Debtors' closed offices were appropriately returned, stored, or destroyed.

159.   Upon information and belief, no personnel or resources were made available to collect written consents from clients or otherwise complete the process of transitioning clients to Acquiring Attorneys after the effective date of the assignment for the benefit of creditors.

160.   Aleman admitted that, although communications with clients were often made by email, the Debtors' email server was left at the Debtors' headquarters, the Debtors did not make a backup of their emails, and no actions were taken to protect the confidentiality of attorney client communications contained in the Debtors' email or preserve important client documents.

161.   Aleman took the Assignee on a tour of the Debtors' Chicago headquarters, left all the Debtors' records and computers at the headquarters, and introduced the Assignee to the Building Manager.

162.    Upon information and belief, the Assignee believes that the computers and servers left in the Debtors' headquarters were "wiped clean" by the Debtors and certain computers or servers were missing.

163.    Although Aleman alleges he identified Gustafson's and the bookkeepers' computers for the Assignee, Aleman did not recall whether he informed the Assignee that the Debtors' QuickBooks files resided on those computers and only on those computers.

164.    Upon information and belief, Aleman did not provide the Assignee with the QuickBooks or other financial information such as an accounts receivable or accounts payable records.

165.    Aleman did not recall whether he informed the Assignee that the server with the LH-1 was located in Kankakee or make arrangements to provide the Assignee with the LH-1.

166.    Although the Debtors delivered their bank accounts to the Assignee, including the IOLTA accounts, absent the LH-1 records, the Assignee could not determine which funds in the IOLTA accounts belonged to which clients.

167.    Aleman admits that five boxes of the Debtors' original corporate documents that were part of Gustafson's files were not delivered to the Assignee but were retained by Aleman.

168.    Aleman testified that he did not deliver those boxes of documents to the Assignee because they were "important."

169.    Aleman testified to the effect that he only provided to the Assignee what the Assignee requested and if the Assignee did not specifically ask for something, Macey and Aleman did not provide it to him.

**M.    Transition from Assignee to Trustee**

170.    Upon her appointment, the Trustee requested turnover from the Assignee of all of the Debtors' assets, books and records.

22

171.    The Assignee was unable to provide basic financial information concerning the Debtors, such as the Debtors' QuickBooks records, an accounts payable or accounts receivable aging, or complete creditor list because they had never been provided to him by the Debtors.

172.    Furthermore, the Assignee, through counsel, advised the Trustee that the computers and servers he received from the Debtors were wiped clean.

173.    The Trustee made demand on Macey and Aleman for information concerning the Debtors' customers.

174.    Aleman provided the Trustee with 16 Excel spreadsheets with millions of lines of data that that he claimed represented all of the information regarding the Debtors' clients stored on LH-1; however, Aleman did not provide the Trustee with the LH-1 software that was required to review the data.

175.    Neither Aleman, Macey nor any other representative of the Debtors advised the Trustee that the LH-1 software was stored on a server located in Kankakee, Illinois until several months after her appointment.

176.    In or about February or March of 2015, Aleman provided the Trustee with certain instructions to operate the LH-1.

177.    At that tutorial, Aleman advised the Trustee, for the first time, that Chrystal Reports would be required to generate basic informational reports from LH-1.

178.    Although Chrystal Reports were used to generate reports in connection with the Transition Agreements as late as December 31, 2012, Aleman claimed that he did not know where the Chrystal Report software could be located.

179.    Although there is an electronic folder stored on the Kankakee server named "Chrystal Reports," that folder is empty.

## N.    Transfers to Affiliates

180.    The Debtors' QuickBook files include what appear to be evidence of transfers to other entities owned or controlled by Macey, Aleman, and Searns in the one year ("**Affiliate One Year Transfers**"), two years ("**Affiliate Two Year Transfers**"), and four years ("**Affiliate Four Year Transfers**") prior to the Petition Date as follows:

| Payee | Aggregate Payments One Year Prior to Petition Date | Aggregate Payments Two Years Prior to Petition Date | Aggregate Payments Four Years Prior to Petition Date |
|---|---|---|---|
| Legal Helpers Debt Resolution | - | $12,300.00 | $25,200.00 |
| Legal Helpers PC Vendor Pmt | - | $1,257,030.43 | $9,627,320.97 |
| Legal Mbi Chi Rtn Offset | $444,325.98 | $511,446.78 | $511,446.78 |
| Mb Law Vendor Pmt | $3,121,940.24 | $7,707,640.34 | $7,707,640.34 |
| Total | $3,566,266.22 | $9,488,417.55 | $17,871,608.09 |

181.    Neither Macey nor Aleman could identify the purpose of the transfers or the identity of the transferees.

182.    Each of the Affiliate One Year Transfers, Affiliate Two Year Transfers, and Affiliate Four Year Transfers are set forth on Exhibits A, B, C, and D, attached hereto.

## O.    Debtors' Transfers to Macey or for His Benefit

183.    Based on the Debtors' QuickBooks and bank records, the Debtors made the following payments to Macey or for Macey's benefit in the one year period prior to the Petition Date (the "**Macey One Year Transfers**"):

(a)    $2,592,871.10 in payments to American Express for an account that was either in the name of the Debtors and personally guaranteed by Macey or that was Macey's personal account, inclusive of $108,167.21 made just two weeks prior to the assignment for the benefit of creditors; and

(b)    $3,566,266.22 in Affiliate One Year Transfers.

184.    Based on the Debtors' QuickBooks, the Debtors made the following payments to Macey or for Macey's benefit in the two year period prior to the Petition Date (the "**Macey Two Year Transfers**"):

    (a)    $7,690,305.74 in payments to American Express for an account that was either in the name of the Debtors and personally guaranteed by Macey or that was Macey's personal account; and

    (b)    $9,488,417.55 in Affiliate Two Year Transfers;

185.    Based on the Debtors' QuickBooks and bank records, the Debtors made the following payments to Macey or for Macey's benefit in the four year period prior to the Petition Date (the "**Macey Four Year Transfers**"):

    (a)    not less than $15,271,823.22 in payments to American Express for an account that was either in the name of the Debtors and personally guaranteed by Macey or that was Macey's personal account;

    (b)    not less than $17,871,608.09 in Affiliate Four Year Transfers

    (c)    $808,616.36 in transfers to Clear Title Group LLC, Miami Beach, Florida

    (d)    not less than $1,283,366.55 in wire transfers to, upon information and belief, an account in which Macey had an interest; and

    (e)    a $10,000 transfer to the Bellagio Casino, Las Vegas, Nevada.

186.    Each of the Macey One Year Transfers, Macey Two Year Transfers, and Macey Four Year Transfers (the "**Macey Transfers**") is set forth on Exhibits A, B, C, D, E, F, and G, attached hereto.

**P.    Debtors' Transfers to Aleman or for His Benefit**

187.    Based on the Debtors' QuickBooks, the Debtors transferred $3,566,266.22 in Affiliate One Year Transfers, for Aleman's benefit, to entities owned or controlled by Aleman in the one year period prior to the Petition Date (the "**Aleman One Year Transfers**").

188.    Based on the Debtors' QuickBooks and Profit and Loss statements, the Debtors made the following payments to Aleman or for Aleman's benefit in the two year period prior to

the Petition Date (the "**Aleman Two Year Transfers**"):

    (a)       not less than $69,866.90 in salary;

    (b)       $9,488,417.55 in Affiliate Two Year Transfers; and

    (c)       not less than $12,362.00 in 401K contributions.

189.    Based on the Debtors' QuickBooks and Profit and Loss statements, the Debtors made the following payments to Aleman or for Aleman's benefit in the four year period prior to the Petition Date (the "**Aleman Four Year Transfers**"):

    (a)       not less than $167,066.00 in salary;

    (b)       not less than $17,871,608.09 in Affiliate Four Year Transfers;

    (c)       not less than $23,708.00 in 401K contributions; and

    (d)       not less than $122,993.29 in connection with the Debtors' profit sharing arrangement.

190.    Each of the Aleman One Year Transfers, Aleman Two Year Transfers and Aleman Four Year Transfers (the "**Aleman Transfers**"), are set forth on Exhibits A, B, C, D, H, I, and J, attached hereto.

**Q.**    **Debtors' Transfers to Gustafson or for His Benefit**

191.    Based on the Debtors' and Profit and Loss statements, the Debtors transferred not less than $34,076.16 in salary to Gustafson or for Gustafson's benefit in the two year period prior to the Petition Date (the "**Gustafson Two Year Transfers**").

192.    Based on the Debtors' QuickBooks and Profit and Loss statements, the Debtors made the following payments to Gustafson or for Gustafson's benefit in the four year period prior to the Petition Date (the "**Gustafson Four Year Transfers**"):

    (a)       not less than $57,406.21, in connection with the Debtors' profit sharing arrangement;

    (b)       not less than $9,800.00 in 401K contributions; and

    (c)      not less than $47,473.70 in salary.

193.    Each of the Gustafson Two Year Transfers and Gustafson Four Year Transfers (the "**Gustafson Transfers**") is set forth on Exhibits I, J, and K, attached hereto.

**R.**    **Debtors Transfers to Kasturi or for Her Benefit**

194.    Based on the Debtors' QuickBooks, the Debtors made not less than $331,231.41 of transfers to Kasturi or for Kasturi's benefit in the one year period prior to the Petition Date (the "**Kasturi One Year Transfers**" and together with the Macey One Year Transfers, Aleman One Year Transfers, and Gustafson One Year Transfers, the "**One Year Transfers**"):

195.    Based on the Debtors' QuickBooks and Profit and Loss statements, the Debtors made the following payments to Kasturi or for Kasturi's benefit in the two year period prior to the Petition Date (the "**Kasturi Two Year Transfers**"):

    (a)      not less than $12,908.00 in 401K contributions; and

    (b)      $1,056,632.07 in other transfers.

196.    Based on the Debtors' QuickBooks and Profit and Loss statements, the Debtors made the following payments to Kasturi or for Kasturi's benefit in the four year period prior to the Petition Date (the "**Kasturi Four Year Transfers**"):

    (a)      not less than $59,890.38 in connection with the Debtors' profit sharing arrangement;

    (b)      not less than $26,072.00 in 401K contributions; and

    (c)      $2,315,188.48 in other transfers.

197.    Each of the Kasturi One Year Transfers, Kasturi Two Year Transfers, and Kasturi Four Year Transfers (the "**Kasturi Transfers**") are set forth on Exhibits I, L, and J, attached hereto.

**S.    Debtors' Transfers to G. Macey or for His Benefit**

198.    Based on the Debtors' QuickBooks and Profit and Loss statements, the Debtors made the following payments to G. Macey or for G. Macey's benefit in the two year period prior to the Petition Date (the "**G. Macey Two Year Transfers**"):

      (a)      not less than $59,907.90 in salary; and

      (b)      $5,925.01 in other transfers.

199.    Based on the Debtors' QuickBooks and Profit and Loss statements, the Debtors made the following payments to G. Macey or for G. Macey's benefit in the four year period prior to the Petition Date (the "**G. Macey Four Year Transfers**"):

      (a)      not less than $72,556.01 in connection with the Debtors' profit sharing arrangement;

      (b)      not less than $9,800.00 in 401K contributions; and

      (c)      not less than $92,112.51 in other transfers.

200.    Each of the G. Macey Two Year Transfers and G. Macey Four Year Transfers (the "**G. Macey Transfers**") are set forth on Exhibits I, J, M, and N, attached hereto.

**T.    Debtors' Transfers to Searns or for His Benefit**

201.    Based on the Debtors' QuickBooks, the Debtors transferred $3,566,266.22 in Affiliate One Year Transfers for Searns's benefit to entities owned or controlled by Searns in the one year period prior to the Petition Date (the "**Searns One Year Transfers**").

202.    Based on the Debtors' QuickBooks, the Debtors made the following transfers to Searns or for Searns's benefit in the two year period prior to the Petition Date (the "**Searns Two Year Transfers**" and together with the Macey Two Year Transfers, Aleman Two Year Transfers, Kasturi Two Year Transfers, Gustafson Two Year Transfers, and G. Macey Two Year

28

Transfers, the "**Two Year Transfers**"):

     (a)     $9,488,417.55 in Affiliate Two Year Transfers; and

     (b)     $101,125.00 in other transfers.

203.    Based on the Debtors' QuickBooks, the Debtors made the following transfers to Searns or for Searns's benefit in the four year period prior to the Petition Date (the "**Searns Four Year Transfers**" and together with the Macey Four Year Transfers, Aleman Four Year Transfers, Kasturi Four Year Transfers, Gustafson Four Year Transfers, and G. Macey Four Year Transfers, the "**Four Year Transfers**"):

     (a)     $256,325.97 in other transfers; and

     (b)     not less than $17,871,608.09 in Affiliate Four Year Transfers.

204.    Each of the Searns One Year Transfers, Searns Two Year Transfers and Searns Four Year Transfers (the "**Searns Transfers**" and together with the Macey Transfers, Aleman Transfers, Kasturi Transfers, Gustofson Transfers, and G. Macey Transfers, the "**Voidable Transfers**") are set forth on Exhibits A, B, C, D, and O, attached hereto.

## AS AND FOR A FIRST COUNT AGAINST
## MACEY, ALEMAN, KASTURI, AND GUSTAFSON
### (Negligence)

205.    Plaintiff incorporates each and every allegation in paragraphs 1 through 204 of this Complaint as if fully set forth herein.

206.    At all relevant times, MBL was a professional corporation that registered as a foreign corporation in each of Arizona, California, Colorado, Georgia, Indiana, Michigan, Minnesota, Missouri, Nevada, New Jersey, New York, Ohio, Pennsylvania, Utah, Washington, and Wisconsin.

207.    At all relevant times, Macey was the sole shareholder and an officer of MBL.

208.    As the sole shareholder of MBL, Macey controlled the Debtors' business and

supervised the employees and agents of MBL including, but not limited to, Aleman, Kasturi, and Gustafson.

209.    Macey owed a duty of care to MBL and to each of its clients due to his position as the sole shareholder and officer.

210.    At all relevant times, Aleman was the Debtors' Managing Attorney and one of the Debtors' Senior Attorneys.

211.    As the Managing Attorney and a Senior Attorney, Aleman was responsible for and oversaw substantially all of the Debtors' operations and supervised the Debtors' employees and agents.

212.    At all relevant times, Gustafson was the Debtors' Treasurer and one of the Debtors' Senior Attorneys.

213.    As the Treasurer and a Senior Attorney, Gustafson was responsible for and oversaw the Debtors' finances, functioned as the Debtors' general counsel, and supervised the Debtors' employees and agents.

214.    Aleman and Gustofson each owed a duty of care to MBL and to each of its clients due to his position as an officer and Senior Attorney.

215.    At all relevant times, Kasturi was a Senior Attorney of the Debtors.

216.    As Senior Attorney, Kasturi was responsible for and oversaw the Debtors' operations and supervised the Debtors' employees and agents.

217.    Kasturi owed a duty of care to MBL and to each of its clients due to her position as a Senior Attorney.

218.    Each of Macey, Aleman, Kasturi, and Gustafson breached their respective duties of care to MBL and its clients.  Among other things,

30

(a)     Macey, Aleman, and Gustafson continued to represent to the public that MBL was a professional corporation notwithstanding that its application for renewal of registration for a professional corporation had been denied.

(b)     Macey and Aleman failed to provide adequate notice to the managing attorneys in the Debtors' hub offices that the Debtors were ceasing operations so that such attorneys would stop taking on new clients and could assist in an orderly wind down of the Debtors' operations.

(c)     Macey, Aleman, and Kasturi, failed to provide MBL's clients with notice that MBL was ceasing operations in accordance with applicable law and rules.

(d)     Macey, Aleman, and Kasturi failed to supervise MBL's employees and agents to ensure they provided notice to clients that MBL was ceasing operations in accordance with applicable law and rules.

(e)     Macey, Aleman, and Kasturi failed to provide a reasonable amount of time for clients to object to the transfer of their cases prior to transferring files to Acquiring Attorneys.

(f)     Macey, Aleman, and Kasturi failed to supervise MBL's employees and agents to ensure they provided a reasonable amount of time for clients to object to the transfer of their cases prior to transferring files to Acquiring Attorneys.

(g)     Macey, Aleman, and Kasturi failed to track clients that objected to the transfer of their files to Acquiring Attorneys and return files and funds to such clients.

(h)     Macey, Aleman, and Kasturi failed to supervise MBL's employees and agents to ensure they tracked clients that objected to the transfer of their files to Acquiring Attorneys and returned files and funds to such clients.

(i)     Macey, Aleman, Kasturi, and Gustafson failed to safeguard the personal, confidential, and privileged information in the client files that were not returned to their owners or transferred to Acquiring Attorneys by abandoning the files in hub offices or warehouses.

(j)     Macey, Aleman, Kasturi, and Gustafson failed to supervise MBL's emoloyees and agents, which resulted in their failure to safeguard the personal, confidential and privileged information in the client files that were not returned to their owners or transferred to Acquiring Attorneys and the abandonment of files in hub offices or warehouses.

(k)     Macey, Aleman, and Kasturi transferred and permitted MBL's agents and employees to transfer personal, confidential, and privileged client files to

31

Acquiring Attorneys without the client consent necessary under applicable law and rules.

(l)     Macey, Aleman, Kasturi, and Gustafson failed to return client funds to those clients for whom MBL failed to find substitute counsel.

(m)     Macey, Aleman, Kasturi, and Gustafson failed to supervise MBL's employees and agents, which resulted in their failure to return client funds to those clients for whom MBL failed to find substitute counsel.

(n)     Macey, Aleman, and Gustafson failed to remit client funds, such as prepaid court filing fees and credit counseling fees, to Acquiring Attorneys pursuant to the terms of the applicable Transition Agreement.

(o)     Macey, Aleman, and Gustafson failed to supervise MBL's employees and agents, which resulted in their failure to remit client funds, such as prepaid court filing fees and credit counseling fees, to Acquiring Attorneys, pursuant to the Terms of the applicable Transition Agreement.

(p)     Macey, Aleman, and Gustafson failed to maintain adequate records of client funds on deposit with the Debtors.

(q)     Macey, Aleman, and Gustafson failed to supervise MBL's employees and agents, which resulted in their failure to maintain adequate records of client funds on deposit with the Debtors.

(r)     Macey, Aleman, Kasturi, and Gustafson failed to ensure that MBL otherwise terminated its attorney-client relationships in accordance with applicable law and rules.

(s)     Macey, Aleman, Kasturi, and Gustafson failed to supervise MBL's employees and agents regarding the termination of MBL's attorney-client relationship with its clients to ensure that MBL terminated those relationships in accordance with applicable law and rules.

(t)     Macey, Aleman, Kasturi, and Gustafson failed to maintain business records that are typically maintained in the ordinary course of business of a law firm of the Debtors' size and that reflect the entities' assets, liabilities, accounts payable and receivables and the location of client files.

(u)     Macey, Aleman, Kasturi, and Gustafson failed to supervise MBL's employees and agents, which resulted in the Debtors failing to maintain business records that are typically maintained in the ordinary course of business of a law firm of the Debtors' size and that reflect the entities' assets, liabilities, accounts payable and receivable, and the location of client files.

(v)     Macey, Aleman, Kasturi, and Gustafson wasted the Debtors' assets by transferring the Voidable Transfers to themselves, to other insiders of the Debtors, or for their benefit.

(w)     Macey, Aleman, Kasturi, and Gustafson failed to supervise MBL's employees and agents, which resulted in the waste of the Debtors' assets and the transfer of the Voidable Transfers to Macey, Aleman, Kasturi, Gustofson, Searns, G. Macey or for their benefit.

(x)     Macey, Aleman, and Gustafson failed to preserve the Debtors' critical records such as the Debtors' computers, servers, emails and the Chrystal Reports.

(y)     Macey, Aleman, and Gustafson failed to turn over critical information and documents to the Assignee, such as the LH-1, Chrystal Reports, QuickBooks, a client list, accounts receivable and accounts payable records, and corporate documents, preventing the Assignee from fulfilling his duties to administer the Debtors' assets for the benefit of creditors.

(z)     Macey and Aleman failed to turn over critical information to the Trustee in a timely manner, such as the LH-1 and Chrystal Reports.

219.    MBL has been directly and proximately injured by each of Macey, Aleman, Kasturi, and Gustafson by their breaches of their duties of care.

220.    Macey's, Aleman's, Kasturi's, and Gustafson's breaches of their duties of care to MBL resulted in injuries to MBL's clients in an amount to be determined.

221.    MBL's clients' injuries have damaged the Debtors' Estates to the extent that the Estates are liable to MBL's clients for the injuries such clients suffered as a result of Macey's, Aleman's, Kasturi's, and Gustafson's negligence.

222.    Macey's, Aleman's, Kasturi's, and Gustafson's breaches of their duties to MBL resulted in injuries to Acquiring Attorneys in an amount to be determined.

223.    The injuries suffered by the Acquiring Attorneys have damaged the Debtors' Estates to the extent the Estates are liable to such Acquiring Attorneys for the injuries they suffered as a result of Macey's, Aleman's, Kasturi's, and Gustafson's negligence.

224.    The Estates are also damaged as a result of Macey's Aleman's, Kasturi's, and

Gusafson's negligence as follows:

(a)    Absent the Chrystal Reports, the Estates will be forced to incur costs to generate a usable list of the Debtors' former clients from the millions of lines of data from the Excel spreadsheets provided by Aleman to notify such clients of this case.

(b)    Absent the Chrystal Reports, the Estate will be forced to incur costs to generate the reports of clients funds purportedly on deposit with the Debtors to verify the claims of clients and Acquiring Attorneys

(c)    Absent an index of files stored in warehouses, the Estate will be forced to incur costs to manually review such files in order to notify clients of the existence of such files and to return or destroy such files to the extent the cost cannot be borne by the clients.

(d)    In excess of $38,594,321.52 of transfers referenced in the Debtors' QuickBooks and other books and records files appear to have been wrongfully transferred to Macey, Aleman, Kasturi, Gustafson, Searns, G. Macey, or entities that they own or control.

225.    The Debtors' Estates have been damaged as a result of Macey's, Aleman's, Kasturi's, and Gustafson's breaches of their duties in an amount to be determined at trial but believed to be no less than $38,594,321.52.

226.    Based on the foregoing, judgment should be entered against each of Macey, Aleman, Kasturi and Gustafson in an amount to be determined at trial, together with interest and attorneys' fees.

## AS AND FOR A SECOND COUNT AGAINST MACEY, ALEMAN AND GUSTAFSON
### (Breach of Fiduciary Duties of Loyalty, Good Faith, and Due Care)

227.    Plaintiff incorporates each and every allegation in paragraphs 1 through 204 of this Complaint as if fully set forth herein.

228.    At all relevant times, Macey was the sole owner of MBL, an officer of each of the Debtors, and a person in control of the Debtors.

229.    At all relevant times, Aleman was an officer of each of the Debtors and was a person in control of the Debtors.

230.   At all relevant times, Gustafson was an officer of each of the Debtors and was a person in control of the Debtors.

231.   At all relevant times, Macey, Aleman and Gustafson owed duties of loyalty, good faith and due care to the Debtors.

232.   At all relevant times, Macey, Aleman and Gustafson were each obligated not to assume and engage in the promotion of their personal interests that were incompatible with the superior interests of the Debtors.

233.   Macey, Aleman, and Gustafson each engaged in self-dealing and each breached his duty of loyalty by putting the financial interests of himself above that of MBL by:

> (a)   Causing the Debtors to transfer the Macey Transfers to Macey;
>
> (b)   Causing the Debtors to transfer the Aleman Transfers to Aleman;
>
> (c)   Causing the Debtors to transfer the Gustafson Transfers to Gustafson; and
>
> (d)   Causing the Debtors to transfer the Affiliate Transfers to the Affiliates, which benefitted Macey and Aleman.

234.   Macey, Aleman, and Gustafson each failed to fulfill his duties as an officer or owner of the Debtors in good faith or with the degree of care that an ordinarily prudent person in a like position would have used under similar circumstances by, among other things:

> (a)   Macey, Aleman, and Gustafson continued to represent to the public that MBL was a professional corporation notwithstanding that its application for renewal of registration for a professional corporation had been denied.
>
> (b)   Macey and Aleman failed to provide adequate notice to the managing attorneys in the Debtors' hub offices that the Debtors were ceasing operations so that such attorneys would stop taking on new clients and could assist in an orderly wind down of the Debtors' operations.
>
> (c)   Macey and Aleman failed to provide MBL's clients with notice that MBL was ceasing operations in accordance with applicable law and rules.

(d)     Macey and Aleman failed to supervise MBL's employees and agents to ensure they provided notice to clients that MBL was ceasing operations in accordance with applicable law and rules.

(e)     Macey and Aleman failed to provide a reasonable amount of time for clients to object to the transfer of their cases prior to transferring files to Acquiring Attorneys.

(f)     Macey and Aleman failed to supervise MBL's employees and agents to ensure they provided a reasonable amount of time for clients to object to the transfer of their cases prior to transferring files to Acquiring Attorneys.

(g)     Macey and Aleman failed to track clients that objected to the transfer of their files to Acquiring Attorneys and return files and funds to such clients.

(h)     Macey and Aleman failed to supervise MBL's employees and agents to ensure they tracked clients that objected to the transfer of their files to Acquiring Attorneys and returned files and funds to such clients.

(i)     Macey, Aleman, and Gustafson failed to safeguard the personal, confidential, and privileged information in the client files that were not returned to their owners or transferred to Acquiring Attorneys by abandoning the files in hub offices or warehouses.

(j)     Macey, Aleman, and Gustafson failed to supervise MBL's employees and agents, which resulted in their failure to safeguard the personal, confidential, and privileged information in the client files that were not returned to their owners or transferred to Acquiring Attorneys and the abandonment of files in hub offices or warehouses.

(k)     Macey and Aleman transferred and permitted MBL's agents and employees to transfer personal, confidential, and privileged client files to Acquiring Attorneys without the client consent necessary under applicable law and rules.

(l)     Macey, Aleman, and Gustafson failed to return client funds to those clients for whom MBL failed to find substitute counsel.

(m)     Macey, Aleman, and Gustafson failed to supervise MBL's employees and agents, which resulted in their failure to return client funds to those clients for whom MBL failed to find substitute counsel.

(n)     Macey, Aleman, and Gustafson failed to remit client funds, such as prepaid court filing fees and credit counseling fees to Acquiring Attorneys pursuant to the terms of the applicable Transition Agreement.

(o)    Macey, Aleman, and Gustafson failed to supervise MBL's employees and agents, which resulted in their failure to remit client funds, such as prepaid court filing fees and credit counseling fees to Acquiring Attorneys pursuant to the Terms of the applicable Transition Agreement.

(p)    Macey, Aleman, and Gustafson failed to maintain adequate records of client funds on deposit with the Debtors.

(q)    Macey, Aleman, and Gustafson failed to supervise MBL's employees and agents, which resulted in their failure to maintain adequate records of client funds on deposit with the Debtors.

(r)    Macey, Aleman, and Gustafson failed to ensure that MBL otherwise terminated its attorney-client relationships in accordance with applicable law and rules.

(s)    Macey, Aleman, and Gustafson failed to supervise MBL's employees and agents regarding the termination of MBL's attorney-client relationship with its clients to ensure that MBL terminated those relationships in accordance with applicable law and rules.

(t)    Macey, Aleman, and Gustafson failed to maintain business records that are typically maintained in the ordinary course of business of a law firm of the Debtors' size and that reflect the entities' assets, liabilities, accounts payable and receivable and the location of client files.

(u)    Macey, Aleman, and Gustafson failed to supervise MBL's employees and agents, which resulted in the Debtors' failing to maintain business records that are typically maintained in the ordinary course of business of a law firm of the Debtors' size and that reflect the entities assets, liabilities, accounts payable and receivable, and the location of client files.

(v)    Macey, Aleman, and Gustafson wasted the Debtors' assets by transferring the Voidable Transfers to themselves, to other insiders of the Debtors, or for their benefit.

(w)    Macey, Aleman, and Gustafson failed to supervise MBL's employees and agents, which resulted in the waste of the Debtors' assets and the transfer of the Voidable Transfers to Macey, Aleman, Kasturi, Gustafson, Searns, G. Macey or for their benefit.

(x)    Macey, Aleman, and Gustafson represented to the public that MBL was a professional corporation notwithstanding that its application for renewal had been denied.

(y)    Macey, Aleman, and Gustafson failed to preserve the Debtors' critical records such as the Debtors' computers, servers, emails and the Chrystal Reports.

(z) Macey, Aleman, and Gustafson failed to turn over critical information and documents to the Assignee, such as the LH-1, Chrystal Reports, QuickBooks, a client list, accounts receivable and accounts payable records, and corporate documents, preventing the Assignee from fulfilling his duties to administer the Debtors' assets for the benefit of creditors.

(aa) Macey and Aleman failed to turn over critical information to the Trustee in a timely manner, such as the LH-1 and Chrystal Reports.

235. The Debtors' Estates have been injured by Macey's, Aleman's, and Gustafson's breaches of their fiduciary duties and have suffered damages in an amount to be determined.

236. Based on the foregoing, judgment should be entered against each of Macey, Aleman, and Gustafson in an amount to be determined, together with interest and attorneys' fees.

**AS AND FOR A THIRD COUNT AGAINST**
**MACEY, ALEMAN, AND KASTURI**
**(Preferential Transfer, Pursuant to 11 U.S.C. § 547)**
**(Pled in the Alternative to the Fourth, Fifth, Sixth,**
**Seventh, Eighth, and Ninth Causes of Action)**

237. Plaintiff incorporates each and every allegation in paragraphs 1 through 204 of this Complaint as if fully set forth herein.

238. Each of Macey, Aleman, and Kasturi are insiders of the Debtors within the meaning of Bankruptcy Code section 101 and case law.

239. Prior to the Petition Date, the Debtors were indebted to Macey and/or American Express, Aleman, and Kasturi.

240. The Macey One Year Transfers, Aleman One Year Transfers, and Kasturi One Year Transfers were made on account of antecedent debt owed to Macy and/or American Express, Aleman, and Kasturi, respectively.

241. Based upon a review of the Debtors' accounting records and tax returns, the Debtors were insolvent on the dates that the One Year Transfers were made.

242. The Macey One Year Transfers, Aleman One Year Transfers, and Kasturi One

Year Transfers enabled Macey and/or American Express, Aleman, and Kasturi, respectively, to receive more than they would have received if: (a) the transfers had not been made, and (b) Macey and/or American Express, Aleman, and Kasturi received payment of their claims to the extent provided by the provisions of the Bankruptcy Code.

243.    By reason of the foregoing and in accordance with Bankruptcy Code section 550(a), the Trustee may recover the Macey One Year Transfers from Macey, plus interest; the Aleman One Year Transfers from Aleman, plus interest; and, the Kasturi One Year Transfers from Kasturi, plus interest.

### AS AND FOR A FOURTH COUNT AGAINST
### MACEY, ALEMAN, KASTURI, GUSTAFSON, G. MACEY, AND SEARNS
**(Intentional Fraudulent Transfer, Pursuant to 11 U.S.C. § 548(a)(1)(A))**
**(Pled in the Alternative to the Third and Tenth Causes of Action)**

244.    Plaintiff incorporates each and every allegation in paragraphs 1 through 204 of this Complaint as if fully set forth herein.

245.    In the two years prior to the Petition Date, the Debtors transferred: the Macey Two Year Transfers to or for the benefit of Macey; the Aleman Two Year Transfers to or for the benefit of Aleman; the Gustafson Two Year Transfers to or for the benefit of Gustafson; the Kasturi Two Year Transfers to or for the benefit of Kasturi; the G. Macey Two Year Transfers to or for the benefit of G. Macey; and the Searns Two Year Transfers to or for the benefit of Searns.

246.    The Two Year Transfers were made with intent to hinder, delay or defraud an entity to which the Debtors were or became liable to after the date that such transfers were made.

247.    Evidence of the Debtors' actual intent to hinder, delay or defraud creditors includes:

(a)    Macey owned and controlled the Debtors.

(b)    Each of Macey, Aleman, Gustafson, and Kasturi was an insider of the Debtors.

39

(c)     The transfers and the Debtors' assets were concealed in that the Debtors failed to maintain usual and customary business records, failed to turn over basic business records to the Assignee, and failed to safeguard critical information such as the LH-1, Chrystal Reports, and the Debtors' emails.

(d)     Both Macey and Aleman have been suspended from the practice of law in Illinois.

(e)     The transfers were made after Affiliates had been sued or threatened with suit.

(f)     The Debtors removed assets by transferring them to insiders and the Affiliates.

(g)     The Debtors received less than reasonably equivalent value in consideration of the transfers.

(h)     The Debtors were insolvent or became insolvent shortly after the transfers were made.

248.    By reason of the foregoing, the Two Year Transfers constitute avoidable fraudulent transfers pursuant to Bankruptcy Code section 548(a)(1)(A).

249.    By reason of the foregoing and, in accordance with section 550(a) of the Bankruptcy Code, the Trustee may recover: the Macey Two Year Transfers from Macey, plus interest; the Aleman Two Year Transfers from Aleman, plus interest; the Gustafson Two Year Transfers from Gustafson, plus interest; the Kasturi Two Year Transfers from Kasturi, plus interest; the G. Macey Two Year Transfers from G. Macey, plus interest; and, the Searns Two Year Transfers from Searns, plus interest.

## AS AND FOR A FIFTH COUNT AGAINST
## MACEY, ALEMAN, KASTURI, GUSTAFSON, G. MACEY, AND SEARNS
### (Constructive Fraudulent Transfer, Pursuant to
### 11 U.S.C. § 548(a)(1)(B) (i) and (ii)(I), (II), and (III))
### (Pled in the Alternative to the Third and Tenth Causes of Action)

250.    Plaintiff incorporates each and every allegation in paragraphs 1 through 204 of this Complaint as if fully set forth herein.

251.    In the two years prior to the Petition Date, the Debtors transferred: the Macey

Two Year Transfers to or for the benefit of Macey; the Aleman Two Year Transfers to or for the benefit of Aleman; the Gustafson Two Year Transfers to or for the benefit of Gustafson; the Kasturi Two Year Transfers to or for the benefit of Kasturi; the G. Macey Two Year Transfers to or for the benefit of G. Macey; and Searns Two Year Transfers to or for the benefit of Searns.

252.    The Debtors received less than reasonably equivalent value in exchange for such transfers.

253.    Based upon a review of the Debtors' accounting records and tax returns, the Debtors (i) were insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; (ii) were engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining with the Debtors was an unreasonably small capital; or (iii) intended to incur, or believed that the Debtors would incur, debts that would be beyond the Debtors' ability to pay as such debts matured.

254.    By reason of the foregoing, the Two Year Transfers constitute avoidable fraudulent transfers pursuant to Bankruptcy Code section 548(a)(1)(B).

255.    By reason of the foregoing and, in accordance with section 550(a) of the Bankruptcy Code, the Trustee may recover: the Macey Two Year Transfers from Macey, plus interest; the Aleman Two Year Transfers from Aleman, plus interest; the Gustafson Two Year Transfers from Gustafson, plus interest; the Kasturi Two Year Transfers from Kasturi, plus interest; the G. Macey Two Year Transfers from G. Macey, plus interest; and, the Searns Two Year Transfers from Searns, plus interest.

## AS AND FOR A SIXTH COUNT AGAINST
## MACEY, ALEMAN, GUSTAFSON, KASTURI, AND G. MACEY
**(Fraudulent Transfer, Pursuant to 11 U.S.C. § 548(a)(1)(B)(i) and (ii)(IV))**
**(Pled in the Alternative to the Third and Tenth Causes of Action)**

256.    Plaintiff incorporates each and every allegation in paragraphs 1 through 204 of this Complaint as if fully set forth herein.

257.    In the two years prior to the Petition Date, the Debtors transferred: the Macey Two Year Transfers to or for the benefit of Macey; the Aleman Two Year Transfers to or for the benefit of Aleman; the Gustafson Two Year Transfers to or for the benefit of Gustafson; the Kasturi Two Year Transfers to or for the benefit of Kasturi; and the G. Macey Two Year Transfers to or for the benefit of G. Macey.

258.    Prior to the Petition Date, each of Macey, Aleman, Gustafson, Kasturi, and G. Macey was an insider of the Debtors.

259.    Upon information and belief, each of the Two Year Transfers was made pursuant to an employment contract and was not in the ordinary course of the Debtors' business.

260.    Upon information and belief, the Debtors received less than reasonably equivalent value in exchange for the Two Year Transfers.

261.    By reason of the foregoing and, in accordance with section 550(a) of the Bankruptcy Code, the Trustee may recover:  the Macey Two Year Transfers from Macey, plus interest; the Aleman Two Year Transfers from Aleman, plus interest; the Gustafson Two Year Transfers from Gustafson, plus interest; the G. Macey Two Year Transfers from G. Macey, plus interest; the Searns Four Year Transfers from Searns, plus interest; and, the Kasturi Two Year Transfers from Kasturi, plus interest.

## AS AND FOR A SEVENTH COUNT AGAINST
## MACEY, ALEMAN, GUSTAFSON, KASTURI, G. MACEY, AND SEARNS
### (Actual Fraudulent Transfer, Pursuant to 740 Ill. Comp. Stat. 160/5(a)(1))
### (Pled in the Alternative to the Third and Tenth Causes of Action)

262.    Plaintiff incorporates each and every allegation in paragraphs 1 through 204 of this Complaint as if fully set forth herein.

263.    In the four years prior to the Petition Date, the Debtors transferred: the Macey Four Year Transfers to or for the benefit of Macey; the Aleman Four Year Transfers to or for the benefit of Aleman; the Gustafson Four Year Transfers to or for the benefit of Gustafson; the Kasturi Four Year Transfers to or for the benefit of Kasturi; the G. Macey Four Year Transfers to or for the benefit of G. Macey; and the Searns Four Year Transfers to or for the benefit of Searns.

264.    Each of the Four Year Transfers was made with actual intent to hinder, delay, or defraud a creditor of the Debtors.

265.    Actual intent to hinder, delay or defraud a creditor of the Debtors can be inferred from:

(a)    Each of Macey, Aleman, Gustafson, and Kasturi was an insider of the Debtors.

(b)    The transfers and the Debtors' assets were concealed in that the Debtors failed to maintain usual and customary business records, failed to turn over basic business records to the Assignee, and failed to safeguard critical information such as the LH-1, Chrystal Reports, and the Debtors' emails.

(c)    Both Macey and Aleman have been suspended from the practice of law in Illinois.

(d)    The transfers were made after Affiliates had been sued or threatened with suit.

(e)    The Debtors removed assets by transferring them to insiders and the Affiliates.

43

(f)    The Debtors received less than reasonably equivalent value in consideration of the transfers.

(g)    The Debtors were insolvent or became insolvent shortly after the transfers were made.

266.    By reason of the foregoing and, in accordance with section 550(a) of the Bankruptcy Code, the Trustee may recover:  the Macey Four Year Transfers from Macey, plus interest; the Aleman Four Year Transfers from Aleman, plus interest; the Gustafson Four Year Transfers from Gustafson, plus interest; the G. Macey Four Year Transfers for G. Macey; and, the Kasturi Four Year Transfers from Kasturi, plus interest.

**AS AND FOR A EIGHTH COUNT AGAINST
MACEY, ALEMAN, GUSTAFSON, KASTURI, G. MACEY, AND SEARNS
(Constructive Fraudulent Transfer, Pursuant to 740 Ill. Comp. Stat. 160/5(a)(2))
(Pled in the Alternative to the Third and Tenth Causes of Action)**

267.    Plaintiff incorporates each and every allegation in paragraphs 1 through 204 of this Complaint as if fully set forth herein.

268.    In the four years prior to the Petition Date, the Debtors transferred:  the Macey Four Year Transfers to or for the benefit of Macey; the Aleman Four Year Transfers to or for the benefit of Aleman; the Gustafson Four Year Transfers to or for the benefit of Gustafson; the Kasturi Four Year Transfers to or for the benefit of Kasturi; the G. Macey Four Year Transfers to or for the benefit of G. Macey; and the Searns Four Year Transfers to or for the benefit of Searns.

269.    The Debtors received less than a reasonably equivalent value in exchange for the Four Year Transfers.

270.    Based upon a review of the Debtors' accounting records and tax returns, the Debtors (i) were engaged or were about to engage in a business or a transaction for which the remaining assets of the Debtors were unreasonably small in relation to the business or

44

transaction; or (ii) intended to incur, or believed or reasonably should have believed that the Debtors would incur, debts beyond their ability to pay as they became due.

271.    There is at least one creditor of the Debtors' Estates with an allowable claim that was a creditor of the Debtors as of the time of the transactions at issue in this Complaint that is still a creditor of the Debtors.

272.    By reason of the foregoing and, in accordance with section 550(a) of the Bankruptcy Code, the Trustee may recover: the Macey Four Year Transfers from Macey, plus interest; the Aleman Four Year Transfers from Aleman, plus interest; the Gustafson Four Year Transfers from Gustafson, plus interest; the Kasturi Four Year Transfers from Kasturi, plus interest; the G. Macey Four Year Transfers from G. Macey, plus interest; and the Searns Four Year Transfers from Searns, plus interest.

### AS AND FOR A NINTH COUNT AGAINST
### MACEY, ALEMAN, GUSTAFSON, KASTURI, G. MACEY, AND SEARNS
**(Constructive Fraudulent Transfer, Pursuant to 740 Ill. Comp. Stat. 160/6(a))**
**(Pled in the Alternative to the Third and Tenth Causes of Action)**

273.    Plaintiff incorporates each and every allegation in paragraphs 1 through 204 of this Complaint as if fully set forth herein.

274.    In the four years prior to the Petition Date, the Debtors transferred: the Macey Four Year Transfers to or for the benefit of Macey; the Aleman Four Year Transfers to or for the benefit of Aleman; the Gustafson Four Year Transfers to or for the benefit of Gustafson; the Kasturi Four Year Transfers to or for the benefit of Kasturi; the G. Macey Four Year Transfers to or for the benefit of G. Macey; and the Searns Four Year Transfers to or for the benefit of Searns.

275.    The Debtors received less than reasonably equivalent value in exchange for the Four Year Transfers.

276.    Based upon a review of the Debtors' accounting records and tax returns, the Debtors were insolvent at the time of such transfers.

277.    There is at least one creditor of the Debtors' Estates with an allowable claim that was a creditor of the Debtors as of the time of the transactions at issue in this Complaint that is still a creditor of the Debtors.

278.    By reason of the foregoing and, in accordance with section 550(a) of the Bankruptcy Code, the Trustee may recover:  the Macey Four Year Transfers from Macey, plus interest; the Aleman Four Year Transfers from Aleman, plus interest; the Gustafson Four Year Transfers from Gustafson, plus interest; the Kasturi Four Year Transfers from Kasturi, plus interest; the G. Macey Four Year Transfers from G. Macey, plus interest; and the Searns Four Year Transfers from Searns, plus interest.

<u>AS AND FOR A TENTH COUNT AGAINST
MACEY, ALEMAN, AND KASTURI</u>
**(Fraudulent Transfer, Pursuant to 740 Ill. Comp. Stat. 160/6(b))**
**(Pled in the Alternative to the Fourth, Fifth, Sixth,
Seventh, Eighth, and Ninth Causes of Action)**

279.    Plaintiff incorporates each and every allegation in paragraphs 1 through 204 of this Complaint as if fully set forth herein.

280.    At all relevant times, Macey, Aleman, and, Kasturi were insiders of the Debtors as such term is defined in 740 Ill. Comp. Stat. 160/2(g).

281.    In the one year prior to the Petition Date, the Debtors transferred:  the Macey One Year Transfers to or for the benefit of Macey on account of antecedent debt; the Aleman One Year Transfers to or for the benefit of Aleman on account of antecedent debt; and the Kasturi One Year Transfers to or for the benefit of Kasturi on account of antecedent debt.

282.    Based upon a review of the Debtors' accounting records and tax returns, the Debtors were insolvent on the date that each of the One Year Transfers were made.

46

283.    There is at least one creditor of the Debtors' Estates with an allowable claim that was a creditor of the Debtors as of the time of the transactions at issue in this Complaint that is still a creditor of the Debtors.

284.    By reason of the foregoing and, in accordance with section 550(a) of the Bankruptcy Code, the Trustee may recover:  the Macey One Year Transfers from Macey, plus interest; the Aleman One Year Transfers from Aleman, plus interest; and the Kasturi One Year Transfers from Kasturi, plus interest.

## AS AND FOR A ELEVENTH COUNT AGAINST MACEY
### (For Personal Liability For The Debtors' Debts
### Pursuant to IL. St. CH. 805 § 10/12 and IL. R. S. CT. Rule 721)

285.    Plaintiff incorporates each and every allegation in paragraphs 1 through 204 of this Complaint as if fully set forth herein.

286.    In or about March 2013, the Supreme Court of Illinois denied MBL's motion for leave to renew its registration to practice law as a professional corporation.

287.    Effective March 28, 2013, MBL was no longer a registered professional corporation under the Illinois Business Organizations Act.

288.    Macey is and, at all relevant times, was the sole owner of MBL.

289.    As such, Macey is personally liable for all debts incurred by the Debtors after March 28, 2013.

290.    The Debtors incurred liabilities in an undetermined amount.

291.    By reason of the foregoing, Macey is liable to the Plaintiff in an amount to be determined.

**WHEREFORE,** Plaintiff respectfully requests that this Court enter judgment in her favor as follows:

(i)     On the First Count against each of Macey, Aleman, Kasturi, and Gustafson, for an amount to be determined at trial, that is no less than $38,505,806.77, plus interest and reasonable attorneys' fees.

(ii)    On the Second Count against each of Macey, Aleman, and Gustafson for an amount to be determined at trial, that is no less than $8,505,806.77, plus interest and reasonable attorneys' fees.

(iii)   On the Third Count against Macey, for an amount to be determined at trial, that is no less than $6,159137.32, Aleman, for an amount to be determined at trial, that is no less than $3,566,266,22, and Kasturi, for an amount to be determined at trial, that is no less than $331,231,41, plus interest and reasonable attorneys' fees.

(iv)    On the Fourth Count against Macey, for an amount to be determined at trial, that is no less than $17,178,723.29, Aleman, for an amount to be determined at trial, that is no less than $9,570,646.45, Kasturi, for an amount to be determined at trial, that is no less than $1,069,540.07, Gustafson, for an amount to be determined at trial, that is no less than $34,076.16, G. Macey, for an amount to be determined at trial, that is no less than $65,832.91, and Searns, for an amount to be determined at trial, that is no less than $9,589,542.55, plus interest and reasonable attorneys' fees.

(v)     On the Fifth Count against Macey, for an amount to be determined at trial, that is no less than $17,178,723.29, Aleman, for an amount to be determined at trial, that is no less than $9,570,646.45, Kasturi, for an amount to be determined at trial, that is no less than $1,069,540.07, Gustafson, for an amount to be determined at trial, that is no less than $34,076.16, G. Macey, for an amount to be determined at trial, that is no less than $65,832.91, and Searns, for an amount to be determined at trial, that is no less than $9,589,542.55, plus interest and reasonable attorneys' fees.

(vi)    On the Sixth Count against Macey, for an amount to be determined at trial, that is no less than $17,178,723.29, Aleman, for an amount to be determined at trial, that is no less than $9,570,646.45, Kasturi, for an amount to be determined at trial, that is no less than $1,069,540.07, Gustafson, for an amount to be determined at trial, that is no less than $34,076.16, and G. Macey, for an amount to be determined at trial, that is no less than $65,832.91, plus interest and reasonable attorneys' fees.

(vii)   On the Seventh Count against Macey, for an amount to be determined at trial, that is no less than $35,245,414.22, Aleman, for an amount to be determined at trial, that is no less than $18,185,375.38, Gustafson, for an amount to be determined at trial, that is no less than $114,679.91, Kasturi, for an amount to be determined at trial, that is no less than $2,401,150.86,

G. Macey, for an amount to be determined at trial, that is no less than $174,468.52, and Searns, for an amount to be determined at trial, that is no less than $18,127,934.06, plus interest and reasonable attorneys' fees.

(viii)    On the Eighth Count against Macey, for an amount to be determined at trial, that is no less than $35,245,414.22, Aleman, for an amount to be determined at trial, that is no less than $18,185,375.38, Gustafson, for an amount to be determined at trial, that is no less than $114,679.91, Kasturi, for an amount to be determined at trial, that is no less than $2,401,150.86, G. Macey, for an amount to be determined at trial, that is no less than $174,468.52, and Searns, for an amount to be determined at trial, that is no less than $18,127,934.06, plus interest and reasonable attorneys' fees.

(ix)    On the Ninth Count against Macey, for an amount to be determined at trial, that is no less than $35,245,414.22, Aleman, for an amount to be determined at trial, that is no less than $18,185,375.38, Gustafson, for an amount to be determined at trial, that is no less than $114,679.91, Kasturi, for an amount to be determined at trial, that is no less than $2,401,150.86, G. Macey, for an amount to be determined at trial, that is no less than $174,468.52, and Searns, for an amount to be determined at trial, that is no less than $18,127,934.06, plus interest and reasonable attorneys' fees.

(x)    On the Tenth Count against Macey, for an amount to be determined at trial, that is no less than $6,159137.32, Aleman, for an amount to be determined at trial, that is no less than $3,566,266,22, and Kasturi, for an amount to be determined at trial, that is no less than $331,231,41, plus interest and reasonable attorneys' fees.

(xi)    On the Eleventh Count against Macey, for an amount to be determined at trial, plus interest and reasonable attorneys' fees.

Dated: Garden City, New York
May 29, 2015

MEYER, SUOZZI, ENGLISH & KLEIN, P.C.

By:    _/s/ Jil Mazer-Marino_
        Alan E. Marder, Esq.
        Jessica G. Berman, Esq.
        Jil Mazer-Marino, Esq.
        990 Stewart Avenue – Suite 300
        Garden City, New York  11530-9194
        (516) 741-6565

1043473

49